# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SALZMAN, *et al.*,

        *Plaintiffs*,

    v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

        *Defendants.*

Civil Action No. 17-2475 (RDM)

## MEMORANDUM OPINION

On September 4, 1997, three Hamas suicide bombers detonated explosives at a pedestrian mall on Ben Yehuda Street in Jerusalem, Israel. *See Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 260–61 (D.D.C. 2003). Among the nearly two hundred injured were Diana Campuzano, Avi Elishis, and Gregg Salzman ("the *Campuzano* plaintiffs"). *Id.* In 2000, the *Campuzano* plaintiffs filed suit against the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), the Iranian Revolutionary Guard Corps ("IRGC"), and three Iranian officials ("the *Campuzano* defendants") under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq. Id.* The *Campuzano* plaintiffs alleged that the *Campuzano* defendants were liable for their injuries because they had provided material support to Hamas to carry out the attack. *Id.* The Court concluded that it had subject matter jurisdiction over the *Campuzano* plaintiffs' claims and found that the defendants were liable. *Id.* at 269. Accordingly, on September 10, 2003, the Court entered a default judgment against Iran and the other defendants and awarded the *Campuzano* plaintiffs compensatory and punitive damages. *Id.* at 270–79; *see also* Dkt. 52, Civ. No. 00-2328.

More than fourteen years later, nine immediate family members of the *Campuzano* plaintiffs, who were not parties to the *Campuzano* suit, filed this action against Iran, the MOIS, and the IRGC under the FSIA, seeking damages for their "pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium" as a result of the *Campuzano* plaintiffs' injuries.  Dkt. 2 at 15, 16 (Amd. Compl. ¶ 83, Prayer).  Plaintiffs have voluntarily dismissed the MOIS and the IRGC as defendants, *see* Dkt. 26; Minute Order (Jul. 18, 2019) (Order of Dismissal), but they continue to press their claims against Iran.  Iran, in their view, is liable for their injuries under the "terrorism exception" to the FSIA, 28 U.S.C. § 1605A, because the Ben Yehuda Street attack would not have occurred "but-for Iran's 'provision of material support or resources'" to Hamas, Dkt. 21 at 10 (quoting 28 U.S.C. § 1605A(a)(1)).  The matter is now before the Court on Plaintiffs' motion seeking entry of a default judgment against Iran.  Dkt. 21.  For the reasons described below, the Court will enter a default judgment against Iran and will award Plaintiffs compensatory damages.

## I.  INTRODUCTION

Plaintiffs in this case are nine family members of the *Campuzano* plaintiffs: Stanley and Roberta Salzman (the parents of Gregg Salzman), Lee Salzman (the brother of Gregg Salzman), Ramiro and Mabel Campuzano (the parents of Diana Campuzano), Jorge Campuzano (the brother of Diana Campuzano), Brenda Elishis (the mother of Avi Elishis), the estate of David Elishis (the late father of Avi Elishis), and Sara Walzman (the sister of Avi Elishis).  Dkt. 21 at 7.  Plaintiffs are all U.S. citizens.  *Id.*; Dkt. 28; Dkt. 33.  Plaintiffs' Amended Complaint seeks compensatory damages for "pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of

solatium." Dkt. 2 at 15 (Amd. Compl. ¶ 83). They also allege that Defendants' conduct "warrant[s] an award of punitive damages under 28 U.S.C. § 1605A(c)." *Id*. (Amd. Compl. ¶ 87). In their motion for default judgment, however, Plaintiffs seek only solatium damages. *See* Dkt. 21 at 13–16.

Even in a garden variety suit, the entry of a default judgment is "not automatic" and requires the exercise of sound discretion. *See Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005); *Sanchez v. Devashish Hospitality, LLC*, 322 F.R.D. 32, 36 (D.D.C. 2017); *Boland v. Yoccabel Const. Co., Inc.*, 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). The Court must—at a minimum—satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over the defendants. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that the Court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."). In cases brought against a foreign state, however, the Court's discretion to enter a default judgment is even more narrowly circumscribed. By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This is the same standard that applies to default judgments against the United States under Federal Rule of Civil Procedure 55(d). *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003).

Plaintiffs must, accordingly, carry the burden of showing that the Court has subject matter and personal jurisdiction, and they must establish their right to recover by producing evidence satisfactory to the Court. To establish subject matter jurisdiction, Plaintiffs must show

3

that: (1) the "terrorism exception" to the FSIA applies—that is, they must show that they seek money damages from a foreign state for personal injury or death caused by a covered act of terrorism or "the provision of material support or resources for such an act;" (2) the foreign state was designated as a state sponsor of terrorism at the time of the act of terrorism (or because of the act) and remained so designated at the time the suit was brought (or shortly before suit was brought); and (3) "the claimant or the victim was, at the time" of the act of terrorism, "a national of the United States," a member of the U.S. military, or an employee (or contractor) of the United States acting within the scope of her employment. 28 U.S.C. § 1605A(a). To establish personal jurisdiction, Plaintiffs must show that the Court has subject matter jurisdiction over their claims and that Iran was served in accordance with 28 U.S.C. § 1608. 28 U.S.C. § 1330(b). And, to establish a right to recover, Plaintiffs must offer evidence showing that they satisfy either (1) each of the elements of the cause of action set forth in 28 U.S.C. § 1605A(c) or (2) each of the elements of a common law tort cause of action. *See Owens*, 864 F.3d at 809.

In a case, such as this, in which Plaintiffs allege that a foreign state materially supported acts of terrorism, the district court must determine "how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). But the Court must do so in light of Congress's purpose in enacting § 1605A—that is, to "compensate the victims of terrorism . . . [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *id*. at 1048 (citation omitted)—and the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens*, 864 F.3d at 785.

This case comes before the Court in a unique posture. Because Plaintiffs are seeking damages for loss of solatium, their injuries stem from the same terrorist attack that injured the

*Campuzano* plaintiffs, and their claims present—at least at the threshold—the same essential questions posed in the *Campuzano* case: that is, whether Iran provided "material support" to Hamas and whether that support was the proximate cause of the injuries the *Campuzano* plaintiffs suffered. The *Campuzano* court made extensive findings of fact regarding the Ben Yehuda Street attack, the *Campuzano* plaintiffs' injuries, and Iran's relationship to Hamas. *See Campuzano*, 281 F. Supp. 2d at 261–68. The Court then concluded, based on those factual findings, that Iran was liable for the *Campuzano* plaintiffs' injuries. *Id.* at 270. Plaintiffs ask this Court to adopt the findings of fact and conclusions of law in *Campuzano*. Dkt. 21 at 10–11. The Court declines to do so.

Plaintiffs' principal argument why the liability determinations in *Campuzano* are binding on this Court—that "Iran would be collaterally estopped from re-litigating th[ose] determinations," Dkt. 21 at 11—is incorrect. *See Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 17–19 (D.D.C. 2001) (explaining why offensive collateral estoppel does not apply to default judgments entered under the terrorism exception to the FSIA); *see also* Restatement (Second) of Judgments § 27, cmt. e (1982) ("In the case of a judgment entered by confession, consent or default, none of the issues [are] actually litigated."); *Arizona v. California*, 530 U.S. 392, 413–14 (noting the "general rule that issue preclusion attaches only '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment'" (quoting Restatement (Second) of Judgments § 27 (1982))).

Plaintiffs' fallback contention that the Court should adopt the findings of fact from *Campuzano*, moreover, fares no better. *See Weinstein*, 175 F. Supp. 2d at 20 ("[F]indings of fact made during this type of one-sided [FSIA] hearing should not be given a preclusive effect."). Although prior decisions in this district "have . . . frequently taken judicial notice of earlier,

related proceedings," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010), that does not mean that the Court should simply accept the facts found in the earlier opinion, which would amount to an exercise of collateral estoppel. The Court may, however, "review evidence considered in" the prior proceeding "without necessitating the re-presentment of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010).

Because Plaintiffs did not provide the Court with the evidence upon which the *Campuzano* decision was premised, and because only a portion of that evidence is available in the *Campuzano* docket, the Court held a telephonic conference with counsel on August 28, 2019, and explained that it could not, based on the then-existing record, adjudicate Plaintiffs' claims. Minute Order (Aug. 28, 2019). In response, Plaintiffs have now filed with the Court the essential evidence from the *Campuzano* case. Dkt. 30; Dkt. 31; Dkt. 32. Upon review of that evidence, the Court concludes that it can take judicial notice of the evidence admitted and relied upon in the *Campuzano* case and can—based on the Court's independent assessment of that evidence (but with the benefit of the guidance offered by the *Campuzano* decision)—adjudicate Plaintiffs' claims.

## II. FINDINGS OF FACT

### A. Procedural Background

Stanley Salzman, Lee Salzman, Roberta Salzman, Ramiro Campuzano, Mabel Campuzano, and Jorge Campuzano filed this case on November 16, 2017. Dkt. 1 at 1 (Compl.). On November 20, 2017, they amended their complaint to add Brenda Elishis (both individually and as the administratrix of the estate of her late husband, David Elishis) and Sara Walzman as plaintiffs. Dkt. 2 at 1 (Amd. Compl.). The Clerk first attempted to effect service on Defendants on December 1, 2017. *See* Dkt. 7, 8. After that attempt failed, the Clerk requested the

Department of State to serve Defendants through diplomatic channels. Dkt. 12 at 1. The summons, amended complaint, and notice of suit were delivered to the Iranian Ministry of Foreign Affairs, with the assistance of the Foreign Interest Section of the Embassy of Switzerland in Tehran because the United States does not maintain diplomatic relations with Iran. *See* Dkt. 17 at 1. The State Department, however, requested that the Foreign Interest Section serve only one defendant: "the Islamic Republic of Iran." *Id.* at 11. After the return of service was filed on May 15, 2018, *id.* at 1–12, Plaintiffs filed an affidavit in support of default against the Islamic Republic of Iran, Dkt. 18. Relying on Plaintiffs' affidavit, the Clerk entered default against Iran on July 9, 2018. Dkt. 20 at 1. Plaintiffs then moved for entry of a default judgment against Iran on July 26, 2018, Dkt. 21, and subsequently requested that the other two defendants, which had not yet been served, be dismissed from the case, Dkt. 26. On July 18, 2019, the Court dismissed the MOIS and the IRGC as Defendants. Minute Order (July 18, 2019).

Because Plaintiffs' claims relate to an attack that occurred almost 22 years ago, the Court initially stayed the action, pending a decision by the D.C. Circuit on the question of whether the ten-year statute of limitations contained in 28 U.S.C. § 1605A(b) is subject to forfeiture by a defaulting foreign state. Minute Order (Aug. 20, 2018). After the D.C. Circuit answered that question in the affirmative, *see Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095 (D.C. Cir. 2019), the Court lifted the stay and scheduled a status conference to address further proceedings in the action, Minute Order (May 10, 2019). On August 26, 2019, the Court ordered Plaintiffs to submit evidence sufficient to show that they were U.S. nationals at the time of the Ben Yehuda Street attack. Minute Order (Aug. 26, 2019). Shortly thereafter, the Court informed Plaintiffs' counsel during a telephonic status conference that the then-existing factual record was, in the

Court's view, deficient. Minute Order (Aug. 28, 2019). Plaintiffs then, in response, supplemented the record with the essential evidence that had been offered and admitted in the *Campuzano* case. Dkt. 30; Dkt. 31; Dkt. 32. Other evidence from the *Campuzano* case is available in the docket in that action, Civ. No. 00-2328, and the Court has reviewed that evidence—*i.e.*, the testimony of witnesses that was offered at the hearing—as well.

Plaintiffs' motion for entry of a default judgment is now ripe for adjudication. In lieu of holding an evidentiary hearing, the Court will rely on Plaintiffs' declarations submitted in this case, the testimony presented at the *Campuzano* evidentiary hearing, and the evidence from the *Campuzano* case that Plaintiffs have re-filed in this matter. *See Kim*, 774 F.3d at 1047 (explaining that "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'" (quoting 28 U.S.C. § 1608(e)); *see also Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017) (noting that "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits" as evidence to support an entry of default judgment); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017); *Weinstein*, 175 F. Supp. 2d at 20.

## B.    The Ben Yehuda Street Terrorist Attack

Plaintiffs' suit arises out of the Ben Yehuda Street attack, which took place on September 4, 1997. Three suicide bombers packed their bombs with "nails, screws, pieces of glass, and chemical poisons" in order to maximize "pain, suffering, and death." *Campuzano*, 281 F. Supp. 2d at 261 (citing U.S. Dep't of State, Patterns of Global Terrorism: 1997, Middle East Overview, available at https://1997-2001.state.gov/global/terrorism/1997Report/mideast.html (last accessed Sept. 25, 2019); *see also* Dkt. 30-2 at 15 (Paz Expert Report ¶¶ 81-82); Trial Tr. at 8–9, *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003), No. 00-cv-2328

(ECF 42). The attack killed five people and wounded "nearly two hundred others." *Campuzano*,

281 F. Supp. 2d at 261 (citing U.S. Dep't of State, Patterns of Global Terrorism: 1997, Middle

East Overview); *see also* Trial Tr. at 8–9, *Campuzano*, No. 00-cv-2328 (ECF 42). Eventually

two Hamas operatives, Muadh Said Bilal and Omar Abdel Rahman al-Zaban, were arrested and

charged with carrying out the bombing. Dkt. 30-2 at 13 (Paz Expert Report ¶¶ 69–70); Dkt. 30-4

at 12–13 (Shaked Expert Report ¶ 27); *see also* Trial Tr. at 25, 29–31, 40–41, *Campuzano*, No.

00-cv-2328 (ECF 42). Both were convicted for murder, attempted murder, and membership in

Hamas. Dkt. 30-2 at 13 (Paz Expert Report ¶ 80); Dkt. 30-4 at 12–13 (Shaked Expert Report ¶

27); *see also* Trial Tr. at 40, *Campuzano*, No. 00-cv-2328 (ECF 42). Hamas also claimed

responsibility for the bombing. Dkt. 30-2 at 13–16 (Paz Expert Report ¶ 83); Dkt. 30-3 at 8

(Clawson Expert Report ¶ 28); Dkt. 30-4 at 12–13 (Shaked Expert Report); *see also* Trial Tr. at

9, 27–29, 53, *Campuzano*, No. 00-cv-2328 (ECF 42).

    The Ben Yehuda Street attacks inflicted serious physical injuries on each of the

*Campuzano* plaintiffs. Diana Campuzano suffered, *inter alia*, permanent damage to her vision,

sulfuric-acid inflicted burns, a "destroyed" upper sinus cavity, and a massive skull fracture. *See*

*Campuzano*, 281 F. Supp. 2d at 263; *see also* Trial Tr. at 10–11, *Campuzano*, No. 00-cv-2328

(ECF 41); Dkt. 21-1 at 8–10 (R. Campuzano Decl. ¶¶ 25–32). She suffers from post-traumatic

stress disorder ("PTSD"), and, even two decades later, she cannot concentrate properly, remains

uncomfortable in crowds, and is easily frustrated. *See id.* at 11 (R. Campuzano Decl. ¶ 35). Avi

Elishis was eighteen at the time of the bombing. *Campuzano*, 281 F. Supp. 2d at 264 (citing

Trial Tr. at 84 (ECF 42)). *But see* Dkt. 21-4 at 1 (B. Elishis Decl. ¶ 3) (stating that Avi was

seventeen). His body was embedded with shrapnel, and Avi also suffered first- and second-

degree burns, which required months of painful treatment. *Campuzano*, 281 F. Supp. 2d at 264;

*see also* Trial Tr. at 89–91, *Campuzano*, No. 00-cv-2328 (ECF 42); Dkt. 21-4 at 4–7 (B. Elishis

Decl. ¶¶ 12–18, 23–28).  Since the bombing, Avi has lived in constant physical and emotional

pain.  *Campuzano*, 281 F. Supp. 2d at 264; *see also* Dkt. 21-4 at 8 (B. Elishis Decl. ¶ 29).  Gregg

Salzman sustained burns and permanent nerve damage to his upper lip stemming from a shrapnel

wound as a result of the attack.  *See Campuzano*, 281 F. Supp. 2d at 265 (citing Trial Tr. at 111–

18 (ECF 42)); *see also* Dkt. 21-7 at 2–3 (S. Salzman Decl. ¶¶ 10–12).  He also suffers from

PTSD and "constant physical pain."  *Campuzano*, 281 F. Supp. 2d at 265 (citing Trial Tr. at 123–

24 (ECF 42)); Dkt. 21-7 at 3 (S. Salzman Decl. ¶¶ 12–13, 19).

## C.      Iran's Provision of Material Support to Hamas

Hamas, "an Islamic militant terrorist organization," has long had "a close relationship"

with Iran.  *Campuzano*, 281 F. Supp. 2d at 262; *see also* Trial Tr. at 17, *Campuzano*, No. 00-cv-

2328 (ECF 42) ("By 1992, . . . Iran form[ally] recognized Hamas as the sole legitimate

representative of the Palestinian people and it became the only Palestinian organization to

establish what they called an embassy in Tehran."); Dkt. 30-2 at 5 (Paz Expert Report ¶ 29).  At

the *Campuzano* evidentiary hearing, four experts testified regarding Iran's provision of material

support to Hamas and its role in the Ben Yehuda Street Attack: Dr. Bruce Tefft (retired CIA

officer and counterterrorism expert), Dr. Rueven Paz (researcher and former member of the

Israeli General Security Service), Ronni Shaked (researcher and former member of the Israeli

General Security Service), and Patrick Clawson (deputy director of the Washington Institute for

Near East Policy).[1]  *See* Trial Tr. at 6, 44, 60, 74–75, *Campuzano*, No. 00-cv-2328 (ECF 42); *see

also* Dkt. 30-2 (Paz Expert Report); Dkt. 30-3 (Clawson Expert Report); Dkt. 30-4 (Shaked

---

[1]   The Court concludes that each of these witnesses was qualified to offer expert testimony.  *See*
Fed. R. Evid. 702.

Expert Report); Dkt. 32-1 (Tefft curriculum vita); Dkt. 32 (Tolchin Decl. ¶ 2) (noting that Bruce

Tefft testified at the hearing but did not submit an expert report). The plaintiffs also offered the

videotaped deposition of Yigal Presler, a counterterrorism advisor to the Israeli Prime Minister.

*Campuzano*, 281 F. Supp. 2d at 262 (citing Ex. 56, Presler Dep. Tr. at 12); *see also* Trial Tr. at

82, *Campuzano*, No. 00-cv-2328 (ECF 42); Dkt. 31-1 at 10–16 (Presler Dep.). The Court relies

on their uncontroverted and credible testimony to find the following facts and to conclude that

Iran provided both economic assistance and terrorist training to Hamas and that the Ben Yehuda

Street attack could not have occurred without that support.

With respect to economic assistance, by 1992, Iran was providing Hamas $30 million a

year. Trial Tr. at 17, *Campuzano*, No. 00-cv-2328 (ECF 42); *see also* Dkt. 30-3 at 7–19

(Clawson Expert Report); Dkt. 30-2 at 9–11 (Paz Expert Report). Iran's financial contributions

to Hamas between 1990 and 1995 totaled "over $100 million." Trial Tr. at 17, *Campuzano*, No.

00-cv-2328 (ECF 42). This support was channeled through the MOIS, Iran's intelligence

service, and the IRGC. Dkt. 30-3 at 9 (Clawson Expert Report ¶ 32); Trial Tr. at 21, 71, 81,

*Campuzano*, No. 00-cv-2328 (ECF 42). Indeed, "Iranian government support for terrorism is an

official state policy, and the approval of high-ranking Iranian political figures . . . was necessary

for Iranian agencies such as the MOIS to support Hamas with training and economic assistance."

Dkt. 30-2 at 10 (Paz Expert Report ¶ 50); *see also* Dkt. 30-3 at 6, 10 (Clawson Expert Report);

Trial Tr. at 34, 50–53, 80–81, *Campuzano*, No. 00-cv-2328 (ECF 42). Iran "encourage[ed] and

push[ed] Hamas to carry out such attacks [as the Ben Yehuda Street attack] as a [matter of]

policy." Trial Tr. at 34, *Campuzano*, No. 00-cv-2328 (ECF 42). Based on the extensive

evidence and testimony proffered in the *Campuzano* case and re-filed in this case, the Court finds

that Iran provided Hamas substantial financial support to assist and to encourage Hamas to engage in terrorist attacks, like the attack at issue here.

The Court also finds, crediting that same evidence, that Iran provided training and assistance that was foreseeably used to carry out the Ben Yehuda Street attack. The IRGC, the "action arm or paramilitary arm" of MOIS, provided "all terrorist type[s] of training" at its base in Bekka Valley, Lebanon. Trial Tr. at 13–14, *Campuzano*, No. 00-cv-2328 (ECF 42). Of particular relevance here, the IRGC trained Hamas members, including the Hamas operative Mahmoud Abu Hanoud, who organized, planned, and executed a number of attacks, including the Ben Yehuda Street attack. *Campuzano*, 281 F. Supp. 2d at 262; *see also* Trial Tr. at 50–51, *Campuzano*, No. 00-cv-2328 (ECF 42); Dkt. 30-2 at 11–15 (Paz Expert Report); Dkt. 30-4 at 13–15 (Shaked Expert Report). Because the Ben Yehuda Street bombings required "highly trained" operatives to build the bombs, recruit the suicide bombers, and plan the operation, *see* Trial Tr. at 20, 29–30, *Campuzano*, No. 00-cv-2328 (ECF 42), and because nothing in the record suggests that those operatives received sufficient training from other sources, the Court finds that the bombing could not have occurred without Iranian sponsorship, *see*, *e.g.*, Dkt. 30-4 at 16 (Shaked Expert Report ¶ 39) (That attack was "carried out under the direction of Mahmoud Abu Hanoud using the full gamut of terrorism training acquired by him from his Iranian instructors," and "[i]t is highly unlikely that lacking Abu Hanoud's organization and logistical training three Hamas operatives could have successfully infiltrated the heavily guarded environs of the Ben Yehuda Street mall in downtown Jerusalem carrying explosive laden briefcases").

## D.   Plaintiffs' Injuries

Learning of the *Campuzano* plaintiffs' injuries, tending to them, and dealing with their lasting effects imposed significant hardships on Plaintiffs. Eight of the nine family members

have submitted declarations detailing their mental anguish and emotional suffering. *See* Dkt. 21-7 (S. Salzman Decl.); Dkt. 21-8 (R. Salzman Decl.); Dkt. 21-9 (L. Salzman Decl.); Dkt. 21-1 (R. Campuzano Decl.); Dkt. 21-2 (M. Campuzano Decl.); Dkt. 21-3 (J. Campuzano Decl.); Dkt. 21-4 (B. Elishis Decl.); Dkt. 21-6 (S. Walzman Decl.). Plaintiff Brenda Elishis also seeks damages as the admistratrix of the estate of David Elishis, her late husband. *See* Dkt 21-4 at 7–10 (B. Elishis Decl. ¶¶ 29, 33–34). Having reviewed Plaintiffs' declarations, the Court makes the following findings of fact regarding the effect of the *Campuzano* plaintiffs' injuries on each family member:

1.  *Stanley Salzman*

Stanley Salzman ("Stanley") is Gregg Salzman's father. Dkt. 21-7 at 1 (S. Salzman Decl. ¶ 1). After the attack, Gregg Salzman called his father and told him that he'd been in a bombing. *Id*. at 2 (S. Salzman Decl. ¶ 6). Stanley could not immediately travel to Israel, but, when he was able to eventually visit, he witnessed Gregg "in great pain," with "burned skin" wrapped in bandages. *Id*. (S. Salzman Decl. ¶¶ 8–10). He "couldn't watch" as Gregg underwent the "painful and bloody process" of having his bandages changed "multiple times every day." *Id*. (S. Salzman Decl. ¶ 11). "Shrapnel from the bomb [also] ripped up Gregg's face and damaged a nerve in his face," leaving him with "tremendous pain from this nerve injury" to this day. *Id*. at 3 (S. Salzman Decl. ¶ 12). "[T]he thought that Gregg could have been killed," moreover, continues to make Stanley "terrified." *Id.* at 3 (S. Salzman Decl. ¶ 15).

Stanley also attested that he had to support Gregg financially for many years because Gregg was unable to sustain a career due to his mental health and physical injuries. *Id*. (S. Salzman Decl. ¶¶ 13–14). This included providing Gregg with "a place to live" and "help[ing] with . . . his bills, medical expenses, and student loans." *Id*. (S. Salzman Decl. ¶ 14). The

financial stress of supporting Gregg resulted in Stanley having to twice refinance his own home. *Id*. at 3 (S. Salzman Decl. ¶ 14). Gregg caused tensions in Stanley's marriage, which contributed to his divorce. *Id*. at 3–4 (S. Salzman Decl. ¶ 17). After Stanley's other son Lee got divorced— also in part because of the "Gregg issue," *see* Dkt. 21-9 at 3 (L. Salzman Decl. ¶¶ 12–13)—Lee moved in with Stanley. Dkt. 21-7 at 3–4 (S. Salzman Decl. ¶ 17). To accommodate Lee, Stanley moved into the basement. *Id*. Today, Stanley has a lingering "feeling of sorrow." *Id*. at 4 (S. Salzman Decl. ¶ 19). He "wish[es]" that he could do something to stop Gregg's pain, and it "pains [him] that [he] cannot make [Gregg's] pain go away." *Id*. at 4 (S. Salzman Decl. ¶ 19).

### 2. *Roberta Salzman*

Roberta Salzman ("Roberta") is Gregg Salzman's mother. Dkt. 21-8 at 1 (R. Salzman Decl. ¶ 1). "As a mother," it was "devastating" for Roberta to hear that Gregg was "in a bombing." *Id*. at 3 (R. Salzman Decl. ¶ 9). She was "frightened to the core" to hear that "other people sitting next to Gregg were killed and more severely maimed," and that Gregg was only alive "because of a twist of fate." *Id*. (R. Salzman Decl. ¶ 9).

Roberta and Gregg had a difficult relationship for many years, but it was just beginning to improve around the time of the bombing. *Id*. at 2 (R. Salzman Decl. ¶ 6). "Due to the injuries Gregg suffered," however, it became difficult to continue improving the relationship. *Id*. at 2 (R. Salzman Decl. ¶ 6). Although she has been able to improve her relationship with Lee, she has not been able to do the same with Gregg. *Id*. (R. Salzman Decl. ¶ 6). Had it not been for the bombing, Roberta "very much believe[s]" that she "would have been able to make a lot of progress" in her relationship with Gregg. *Id*. (R. Salzman Decl. ¶ 7). She feels as though the "terrorists who attacked Gregg robbed Gregg" and her of the "chance to grow closer" and she will "forever lament" that. *Id*. at 2 (R. Salzman Decl. ¶ 7).

Finally, Roberta stated that Gregg "was never able to start a true career," despite having graduated from chiropractic school a year before the bombing. *Id*. at 3 (R. Salzman Decl. ¶ 11). It "breaks [her] heart" to know that Gregg "has been in pain constantly for years and there is no cure or relief for it." *Id*. (R. Salzman Decl. ¶ 10). And it pains Roberta that she is "helpless to help him." *Id*. (R. Salzman Decl. ¶ 11).

3. *Lee Salzman*

Lee Salzman ("Lee") is Gregg Salzman's brother. Dkt. 21-9 at 1 (L. Salzman Decl. ¶ 1). Lee stated that he and Gregg were "particularly close as brothers." *Id.* at 2 (L. Salzman Decl. ¶ 8). Lee and Gregg "talked all the time," "went on vacations together," and would "visit each other" when they were in school. *Id*. at 2 (L. Salzman Decl. ¶ 8). Once Gregg returned to the United States, Lee became "very protective" of him, and this "led to tension" in their relationship. *Id*. (L. Salzman Decl. ¶ 10). Lee witnessed Gregg become "depressed and despondent." *Id.* His tense relationship with Gregg "was most intense during the first 10–15 years after the bombing," but has persisted to this day. *Id.* Lee has spent "many thousands of dollars" in financial support for Gregg's "school loans, car payments, medical insurance premiums" and more in the decades since the attack. *Id*. (L. Salzman Decl. ¶ 11).

Lee testified, moreover, that the "Gregg issue" was a "significant factor" in his divorce. *Id*. at 3 (L. Salzman Decl. ¶¶ 12–13). Lee and his ex-wife would "argue about [Lee] helping Gregg constantly." *Id*. at 3 (L. Salzman Decl. ¶ 12). Gregg, Lee, and their mother had a strained relationship preceding the bombing, and this was exacerbated in the bombing's aftermath. *See id*. (L. Salzman Decl. ¶ 13). Following the bombing, and because of the "emotional baggage Gregg carries with him," it has been "more difficult for [Gregg] to improve his relationship" with his mother. *Id.* Today, Lee functions as a "go-between" between his mother and brother and this

is an "added burden" for him, which has, additionally, "created tensions between" Lee and his mother. *Id.*

4.     *Ramiro Campuzano*

Ramiro Campuzano ("Ramiro") is Diana Campuzano's father. Dkt. 21-1 at 1 (R. Campuzano Decl. ¶ 1). On the day of the Ben Yehuda Street attack, he received a telephone call from Jerusalem informing him that Diana had been injured. *Id.* at 1–2 (R. Campuzano Decl. ¶ 5). He was later informed, over the phone, that his daughter "had undergone neurosurgery, and suffered skull fractures, eardrum perforations, a broken nose, multiple burns, and eye damage" and that she was on life support. *Id.* at 2 (R. Campuzano Decl. ¶ 6). After receiving the news, Ramiro tried, but failed, to contact his wife and son who were out of town. *Id.* at 3 (R. Campuzano Decl. ¶ 8). It was only after "beg[ging]" his wife's travel booking company that he was eventually put in touch with his wife and informed her of Diana's condition. *Id.* at 3.

For Ramiro, it was "agonizing to go from thinking Diana was alive and well" to finding out that "she was . . . facing possible brain damage, blindness, or worse." *Id.* at 3 (R. Campuzano Decl. ¶ 10). Although he was eventually able to secure a flight to Israel on September 7, "the whole flight [he] was fearful of what [he] would find." *Id.* at 5 (R. Campuzano Decl. ¶¶ 12–15). Upon arriving at the hospital, Ramiro saw Diana "wrapped in bandages like an Egyptian mummy;" the skin on her face was burned black, and he cried for several minutes in agony. *Id.* at 6 (R. Campuzano Decl. ¶ 16). Ramiro stayed with Diana in the hospital "from about 7:00 a.m. until midnight," every day, for six and a half weeks, as she underwent fourteen surgeries. *Id.* at 6, 8 (R. Campuzano Decl. ¶¶ 17, 26). He was with Diana as she endured the painful process of having her burn wounds cleaned. *Id.* at 6 (R. Campuzano

Decl. ¶ 18).  Doctors discovered that the bombs used in the attack contained sulfuric acid, which had penetrated Diana's skin and prevented her burns from healing.  *Id*. (R. Campuzano Decl. ¶ 18).

After returning to the United States, Ramiro could only work half-time for a period because he needed to take care of Diana.  *Id*. at 9 (R. Campuzano Decl. ¶ 28).  He tended to her personal affairs, paid her rent and other bills, and "had to care for her like a small child."  *Id*. at 9–10 (R. Campuzano Decl. ¶¶ 29, 33).  Ramiro often saw Diana despondent, and he witnessed and tended to her agony on a daily basis.  *See id*. at 11 (R. Campuzano Decl. ¶ 34).  Even though two decades have passed since the bombing, his "mental and emotional scars" from the attack are "still very much present."  *Id*. at 11–12 (R. Campuzano Decl. ¶ 37).

5.    *Mabel Campuzano*

Mabel Campuzano ("Mabel") is Diana Campuzano's mother.  Dkt. 21-2 at 1 (M. Campuzano Decl. ¶ 1).  She was traveling in the Grand Canyon with her son when she learned that Diana was injured in the Ben Yehuda Street attack and was being treated in an intensive care unit in Jerusalem.  *Id*. at 1–2 (M. Campuzano Decl. ¶ 5).  Because Mabel's passport was expired at the time, she was unable to travel with her husband to Israel.  *Id*. at 2 (M. Campuzano Decl. ¶ 6).  This left her feeling "doubly helpless" for being "unable to support [her] daughter during her time of dire need, and unable to support [her] husband during this very emotionally draining time."  *Id*. (M. Campuzano Decl. ¶ 6).  Her situation made her feel "guilty, powerless, and intensely scared and sad."  *Id*. (M. Campuzano Decl. ¶ 6).  To make matters worse, the day after learning about the attack, Mabel saw a copy of USA Today featuring a photograph of Diana, covered in blood.  *Id.* at 2–3 (M. Campuzano Decl. ¶ 8).  Seeing the photograph was "horribly agonizing."  *Id.* (M. Campuzano Decl. ¶ 8).

After a week of hearing reports about her daughter's situation from Ramiro, Mabel was finally able to obtain a passport and travel to Israel on September 14, 1997. *See id.* at 3–4 (M. Campuzano Decl. ¶¶ 9–11). At the hospital, Mabel witnessed Diana undergo painful surgeries and suffer through serious side effects. *Id.* at 4 (M. Campuzano Decl. ¶ 13). Mabel remained in Israel with Diana and Ramiro until October 22. *Id.* at 5 (M. Campuzano Decl. ¶ 14).

After returning to the United States, Mabel tended to Diana through multiple medical complications. *Id.* (M. Campuzano Decl. ¶ 16–18). She cared for Diana as though she were a small child, and witnessed Diana agonize over her physical scars and deteriorated eyesight. *Id.* at 6 (M. Campuzano Decl. ¶ 20). Mabel's role as a mother and caretaker was emotionally taxing because she felt that she "always need[ed] to give Diana emotional support." *Id.* (M. Campuzano Decl. ¶ 22). Even today, twenty years after the attack, she "find[s] [herself] crying about what happened to Diana" and is "constantly concerned about how Diana is going to cope," especially when she is "no longer able to help her." *Id.* at 6–7 (M. Campuzano Decl. ¶¶ 22–23).

6.    *Jorge Campuzano*

Jorge Campuzano ("Jorge") is Diana Campuzano's brother. Dkt. 21-3 at 1 (J. Campuzano Decl. ¶ 1). Jorge learned that Diana had been in a terrorist bombing in Jerusalem soon after watching a news report of the bombing on television. *See id.* (J. Campuzano Decl. ¶ 5). After hearing his mother "scream and cry in agony and pain" and learning of the news, he attested that, "[f]or an instant, time stood still." *Id.* at 1–2 (J. Campuzano Decl. ¶ 5). While Diana was hospitalized and his parents were in Israel, Jorge stayed in the United States to manage both his parents' and Diana's households. *Id.* at 2 (J. Campuzano Decl. ¶ 6). And Jorge continued to help his parents cope with Diana's condition upon their return to the United States. *Id.* at 3 (J. Campuzano Decl. ¶ 9). For Jorge, it was "very difficult watching Diana go through

the healing process." *Id.* (J. Campuzano Decl. ¶ 10). He suffers "immense heartache" from witnessing his sister's "pleasure of living" diminished. *Id.* at 3–4 (J. Campuzano Decl. ¶¶ 10–12).

7. *Brenda Elishis*

Brenda Elishis ("Brenda") is Avi Elishis's mother. Dkt. 21-4 at 1 (B. Elishis Decl. ¶ 1). The Ben Yehuda Street attack took place two days after Avi—who was seventeen at the time—had arrived in Israel. *Id.* at 2 (B. Elishis Decl. ¶¶ 4–5). Soon after hearing of the attack, Brenda contacted the yeshiva where Avi was studying, but "could not reach anyone" for a period of time. *Id.* (B. Elishis Decl. ¶ 6). At one point, she was even told that Avi could not be found, leaving her in an "agonizing vacuum." *Id.* at 3 (B. Elishis Decl. ¶ 7). After Brenda learned that Avi was a victim of the attack, she "dropped everything" and flew to Israel with her husband. *Id.* (B. Elishis Decl. ¶ 10). Upon arriving at the hospital, she saw her son "covered in blood," with "tubes and needles all over his body." *Id.* at 4 (B. Elishis Decl. ¶ 12). The "shock of hearing" that Avi might never walk again was "overwhelming" to her. *Id.* (B. Elishis Decl. ¶ 13). It was "horrifying beyond words" to see her son "pierced with shrapnel, burned, cut from surgery, and in terrible agony." *Id.* at 5 (B. Elishis Decl. ¶ 17).

After Avi was discharged from the hospital, Brenda tended to his medical care. *Id.* at 6 (B. Elishis Decl. ¶ 23). She changed his bandages, washed and applied medicine to the wounds, and scraped away bits of dead skin. *See id.* It was "painful" for Brenda to witness Avi transform into a "more subdued," less "carefree" person who suffered from agoraphobia. *Id.* at 7–8 (B. Elishis Decl. ¶ 29). The bombing and its aftermath were "very emotionally disturbing," causing Brenda to suffer "heart palpitations, disturbed sleep, and depressive thoughts," and rendering her "dysfunctional." Dkt. 21-4 at 8–9 (B. Elishis Decl. ¶¶ 30, 32). As a result, she sought therapy

for PTSD and was prescribed medication for her condition. *Id*. at 9 (B. Elishis Decl. ¶ 31); *see also* Dkt. 21-5 (Dr. William Zangwill Decl.) (attesting to the severity of her condition).

8. *Estate of David Elishis*

Brenda Elishis also seeks damages on behalf of the estate of her late husband, David Elishis ("David"), who passed away in 2006. Dkt. 21-4 at 1 (B. Elishis Decl. ¶ 1). David accompanied her to visit Avi in Israel after the attack. *Id*. at 3 (B. Elishis Decl. ¶ 10). Witnessing Avi in his condition was "worse for [David]" than it was for Brenda, because it "triggered dark memories" of his "horrific" childhood in a slave labor camp in Russia. *Id*. at 3, 5–6 (B. Elishis Decl. ¶¶ 10, 18). David was "terribly traumatized by the experience" of visiting Avi in Israel, and after two weeks needed to return to the United States. *Id*. at 6 (B. Elishis Decl. ¶ 21).

Upon returning home, David also witnessed Avi's painful emotional transformation. *Id*. at 7 (B. Elishis Decl. ¶ 29). Brenda brought her husband to Dr. Zangwill, her therapist. *Id*. at 10 (B. Elishis Decl. ¶ 33). "After two or three visits," however, the doctor told him not to return because "taking off the emotional layers would open a Pandora's box of trauma from living through the War in Europe." *Id*. at 10 (B. Elishis Decl. ¶ 33). David suffered through "emotional pain" in the final years of his life. *Id*. at 10 (B. Elishis Decl. ¶ 34). According to Brenda, the fact that "[David] died . . . when he was just 67 years old" made it "even more horrible that he had to live with this pain during those final years." *Id*. at 10 (B. Elishis Decl. ¶ 34).

8. *Sara Walzman*

Sara Walzman ("Sara") is Avi Elishis's sister. Dkt. 21-6 at 1 (S. Walzman Decl. ¶ 1). According to Sara, "[t]he hours of not knowing where Avi was or what his condition was were

excruciating for the entire family." *Id.* at 2 (S. Walzman Decl. ¶ 4). After her parents left for Israel the next day, Sara was "home alone . . . for two days" and had to face "[a] throng of reporters and news cameras . . . camped outside [her] house." *Id.* at 3 (S. Walzman Decl. ¶ 8). She was finally able to join her parents in Israel two days later. *Id.* at 2 (S. Walzman Decl. ¶ 4).

When she arrived at the hospital, Sara saw that Avi was "a bloody mess" and "covered with burns." *Id.* at 2 (S. Walzman Decl. ¶ 5). She attested that "it was very difficult to see him this way." *Id.* Sara stated:

> To see him in such a condition, and to think that some terrorist had tried to kill him at random, was horrible. It was sad and extremely disturbing to see Avi, who had been a big strong guy lying here like a little sad kid in a hospital with bandages all over and tubes coming out of his body. It was scary to think this could happen, and heartbreaking. Hearing that he had a nail in his pericardium just millimeters from his heart was the most shocking of all.

*Id.*

Sara further testified that, after the attack, the "dynamics in [her] family" changed. *Id.* at 3 (S. Walzman Decl. ¶ 9). Everyone "needed to be taken care of," and "they carried the baggage of the bombing with them." *Id.* at 5 (S. Walzman Decl. ¶ 14). It fell on Sara, who was only 21 at the time, to "support [her] family emotionally." *Id.* at 5 (S. Walzman Decl. ¶¶ 13–14). As a result, Sarah has become "fearful and hypervigilant" in ways that she "never [had been] before." *Id.* at 5 (S. Walzman Decl. ¶ 15). Since the bombing, she has "avoid[ed] large crowds;" "become more suspicious of people;" and has been "too fearful to go to parades or large gatherings." *Id.*

### III. CONCLUSIONS OF LAW

Under the FSIA, a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the plaintiff's claim falls within an express statutory exception. 28 U.S.C. § 1604; *see Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126

(D.C. Cir. 2004). For present purposes, the sole relevant exception is found in the "state-sponsored terrorism exception," 28 U.S.C. § 1605A, which both confers subject-matter jurisdiction on federal courts to hear certain terrorism-related claims, *see* 28 U.S.C. § 1330(a), and recognizes a federal cause of action against those foreign states subject to the exception, *see Owens*, 864 F.3d at 764–65. The FSIA also addresses personal jurisdiction and specifies precise procedures that a plaintiff must follow—at times with the assistance of the Clerk of the Court and the U.S. Department of State—to effect service on a foreign state. 28 U.S.C. § 1608.

The Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear. First, because the FSIA deprives courts of subject-matter jurisdiction in the absence of a relevant exception, a failure to appear does not waive the defense, and the courts are "obligated to consider *sua sponte*" whether they have jurisdiction to hear the case and to order any relief. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable"). Second, with respect to the substance of a plaintiff's state or federal law claims, the FSIA precludes courts from entering a default judgment against a foreign state unless the court is satisfied that the plaintiff has established her right to relief. 28 U.S.C. § 1608(e); *see also Owens*, 864 F.3d at 784–86. Finally, courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.

Each of these requirements implicates a slightly different standard of proof. To establish subject-matter jurisdiction, an FSIA "plaintiff bears an initial burden of production to show [that] an exception to immunity, such as § 1605A, applies." *Owens*, 864 F.3d at 784. To establish

personal jurisdiction over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction." *Mwani*, 417 F.3d at 6–7. Having cleared these initial hurdles, however, "the plaintiff must still prove [her] case on the merits" to prevail on a motion for default judgment against a defaulting sovereign. *Owens*, 864 F.3d at 784. To do so, the plaintiff must "establish" her right to relief, which does not "relieve[ ] the sovereign from the duty to defend" but, nonetheless, requires that the plaintiff offer admissible evidence sufficient to substantiate the essential elements of her claim. *Id.* at 785–86 (quotations omitted).

As explained below, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims; that the Court has personal jurisdiction over Iran; and that Plaintiffs have established their right to recover to the satisfaction of the Court. The Court will, accordingly, award Plaintiffs compensatory damages in the amounts specified below.

**A.     Statute of Limitations**

As a threshold matter, the Court must address whether this case is barred by the FSIA's statute of limitations. *See* 28 U.S.C. § 1605A(b). That provision requires that an action under § 1605A be brought no later than the latter of two dates: "(1) 10 years after April 24, 1996; or (2) 10 years after the date on which the cause of action arose." *Id.* § 1605A(b)(1)–(2). Here, Plaintiffs filed suit in 2017, more than two decades after the Ben Yehuda Street attacks and more than fourteen years after this Court's decision in *Campuzano*. It would appear, then, that Plaintiffs claims are untimely under §1605A(b). That, however, does not end the matter. Earlier this year, the D.C. Circuit held in *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095 (D.C. Cir. 2019), that the FSIA's statute of limitations is an affirmative defense, *not* a jurisdictional bar. *See id.* at 1109, 1114–15. The Court, accordingly, cannot *sua sponte* invoke the time-bar to

dismiss Plaintiffs' claims.  *See id.*  Because Iran has yet to appear in this case, let alone raise the statute of limitations as an affirmative defense, the Court will deem that defense forfeited.

**B.**      **Subject-Matter Jurisdiction and Liability for Plaintiffs' §1605A Claims**

"[T]he [federal] district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect to which the foreign state is not entitled to immunity under" the FSIA.  28 U.S.C. § 1330(a).  The Court, accordingly, has subject-matter jurisdiction over the present "nonjury civil action" against Iran if, but only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied. As explained below, Plaintiffs have carried their burden of establishing that the Court has subject-matter jurisdiction over their claims.  Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), a foreign state is not immune from the jurisdiction of the federal and state courts in cases in which:

> [1] money damages are sought against a foreign state [2] for personal injury or death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [5] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. §1605A(a)(1).  The exception, moreover, applies only if two further requirements are met.  First, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred.  28 U.S.C. § 1605A(a)(2)(A)(ii).  And, second, the foreign state must be designated as a state sponsor of terrorism both at the time the act occurred (or was so designated as a result of the act) and at the time the lawsuit was filed (or was so designated within the six-month period preceding the filing of the suit).  28 U.S.C. § 1605A(a)(2)(A)(i); *see also Owens,* 864 F.3d at 763–64.

Four of these elements are easily established in this case. First, Plaintiffs seek money damages against a foreign state. *See* Dkt. 2 at 14–15 (Amd. Compl. ¶¶ 77–87); *see also* Dkt. 21 at 13–16. Second, they seek to recover for "personal injur[ies]"—their mental and emotional anguish as a result of the *Campuzano* plaintiffs' injuries. *See* Dkt. 2 at 2, 13 (Amd. Compl ¶¶ 1, 68); *see also* 28 U.S.C. § 1605A(c) (providing cause of action for solatium damages). Third, Iran is a designated state sponsor of terrorism and has been since 1984. *See* 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Schultz); *see also Campuzano*, 281 F. Supp. 2d at 262; Trial Tr. at 76, *Campuzano*, No. 00-cv-2328 (D.D.C. 2003) (ECF 42). Fourth, at the time of the Ben Yehuda Street attack, Plaintiffs were all U.S. citizens. *See* Dkt. 21 at 9; Dkt. 28-1 to 28-10; Dkt. 33-1 at 1.

The only jurisdictional question left for the court to answer, then, is whether Plaintiffs' injuries were "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources of such an act" by an "official, employee, or agent of" Iran. 28 U.S.C. § 1605A(a)(1). The Plaintiffs contend that their injuries were caused by an act of extrajudicial killing. The Court agrees notwithstanding the fact that none of the plaintiffs' family members were actually killed in the Ben Yehuda Street attack. The plain text of the statute requires that the claimed injury be "*caused by an act of* . . . extrajudicial killing," not that the injury be an extrajudicial killing itself. 28 U.S.C. § 1605A(a) (emphasis added). The Court must thus determine whether the Ben Yehuda Street attack—the act indisputably at the core of the plaintiffs' family members injuries—constitutes an "extrajudicial killing" within the meaning of the Torture Victim Protection Act ("TVPA"). The Court concludes that it does for the following reasons:

*First*, the Court concludes that the Ben Yehuda Street attack constitutes an "extrajudicial killing" for purposes of the Section 1605A, which borrows its definition of "extrajudicial killing" from the International Convention Against the Taking of Hostages and the TVPA. 28 U.S.C. § 1605A(h)(7). Under the TVPA, "extrajudicial killing" means:

> *a deliberated killing not authorized by a previous judgment* pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

TVPA § 3(a) (emphasis added). As the D.C. Circuit has explained, this definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. It does not matter whether the state actor participated directly in the killing, moreover, as long as it provided material support, *Owens*, 864 F.3d at 770–78, and the killing was carried out "deliberately." *Kim*, 774 F.3d at 1050–51. The Court concludes that all three elements are satisfied here.

To begin, the Ben Yehuda Street attack, which killed five people and injured countless others, constitutes a "killing." *See Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 34 (D.D.C. 2012) (finding that a suicide bombing at a restaurant constituted an extrajudicial killing under the TVPA's definition); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 395 (D.D.C. 2015) (same); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 52–53 (D.D.C. 2009) (finding that a suicide bombing of a United States Embassy building constituted an extrajudicial killing); *see also Campuzano*, 281 F. Supp. 2d at 269–270. Although none of the *Campuzano* plaintiffs died in the attack, that is not dispositive for present purposes. The state-sponsored terrorism exception to the FSIA provides the Court with jurisdiction to consider claims for "personal injury or death that was *caused by an act of . . . extrajudicial killing*." 28 U.S.C. §

1605A(a)(1) (emphasis added). Thus, although Plaintiffs' relatives were not killed, the Ben Yehuda Street attack was undoubtedly an "act of . . . extrajudicial killing," and that act "caused" a range of injuries, including those suffered by the *Campuzano* plaintiffs and their families.

The attack, moreover, was "deliberated." "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Owens v. Republic of Sudan* ("*Owens II*"), 174 F. Supp. 3d 242, 263 (D.D.C. 2016) (citing Webster's Third New International Dictionary 596 (1993); 4 The Oxford English Dictionary 414 (2d ed. 1989); Black's Law Dictionary 492 (9th ed. 2009)), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017). Here, there is ample evidence that the attack was planned and far from impulsive. The three suicide bombers coordinated their attack on a busy pedestrian mall and outfitted their bombs in such a way as to inflict maximum damage. *See Campuzano*, 281 F. Supp. 2d at 261 (citing Ex. 28 at 1); *see also* Trial Tr. at 8–9, *Campuzano v. Islamic Republic of Iran*, No. 00-cv-2328 (D.D.C. 2003) (ECF 42). Ronni Shaked testified at the *Campuzano* evidentiary hearing that the attack could not have occurred without a requisite degree of "training . . . resources . . . [and] money." Trial Tr. at 71– 72, *Campuzano*, No. 00-cv-2328 (Dkt. 42); *see also id.* at 19–21, 44, 51 (testimony of Dr. Bruce Tefft and Dr. Rueven Paz supporting the same proposition); Dkt. 30-4 at 15–16 (Shaked Expert Report) (discussing sophisticated planning used in attack).

Finally, the attack was not authorized "by a prior judgment affording judicial guarantees o[f] due process," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 202 (D.D.C. 2017); *see also Owens*, 864 F.3d at 770, and was not "lawfully carried out under the authority of a foreign nation," TVPA § 3(a). To the contrary, Hamas, a non-state actor, claimed credit for the attack. Trial Tr. at 9, 53–54, *Campuzano*, No. 00-cv-2328 (ECF 42); Dkt. 30-2 at 15–16 (Paz Expert

Report) (quoting Hamas's claims of responsibility). The Court, accordingly, concludes that the

Ben Yehuda Street attack qualifies as an "extrajudicial killing" under 28 U.S.C. § 1605A(a)(1).

*Second*, the Court concludes that Iran provided Hamas with material support to carry out

the extrajudicial killing. The FSIA's definition of "material support or resources" is borrowed

from 18 U.S.C. § 2339A, which includes:

> any property, tangible or intangible, or service, including currency or monetary
> instruments or financial securities, financial services, lodging, training, expert
> advice or assistance, safehouses, false documentation or identification,
> communications equipment, facilities, weapons, lethal substances, explosives,
> personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). The Court concluded in the above findings of fact that Iran provided

as much as $30 million a year in financial contributions to Hamas. Trial Tr. at 6, 17,

*Campuzano*, No. 00-cv-2328 (ECF 42). That, alone, is enough to establish that Iran furnished

"material support" to Hamas. *See Kilburn*, 376 F.3d at 1130 (holding that material support need

not go directly to the specific act itself because money is fungible). But, in any event, there is

also evidence that Iran provided material support to Hamas *specifically for the Ben Yehuda Street*

*attack*. Most notably, Iran trained Mahmoud Abu Hanoud, the chief organizer of the attack, and

Abu Hanoud used that training to conduct the attack. Trial Tr. at 19–20, 44, 51, 71–72,

*Campuzano*, No. 00-cv-2328 (ECF 42); Dkt. 30-2 at 9, 11–13 (Paz Expert Report); Dkt. 30-4 at

13–14 (Shaked Expert Report). And, without "the training and resources and the money" that

Iran provided, "Hamas and Abu Hanoud" could not have conducted the attack. Trial Tr. at 71-

72, *Campuzano*, No. 00-cv-2328 (ECF 42). Iran might not have told Hamas to "go this market

or go to this pedestrian mall or what targets exactly to choose, but [Iran] encouraged [Hamas] to"

commit attacks "in Jerusalem," and "[t]hat . . . policy . . . was approved by the highest authorities

in Iran." *Id.* at 34; *see also id.* at 52 (Iran "wanted [Hamas and Abu Hanoud] to carry out as

many [operations] as possible . . . from . . . shooting to kidnapping . . . to suicide bombings in order to create the maximum panic").  It is abundantly clear, then, that Iran not only provided material support that Hamas used in the attack, but that it did so with support from the highest levels of the Iranian government as part of a policy of encouraging and supporting Hamas-led attacks, like the Ben Yehuda Street attack, designed to generate terror in Jerusalem.

*Third*, and finally, the Court concludes that the injuries at issue were "caused by" Iran's provision of material support to Hamas.  28 U.S.C. § 1605A(a)(1).  An FSIA plaintiff need not show that the defendant state "specifically knew of or intended its support to cause" a particular terrorist act, *Owens*, 864 F.3d at 798, or that the defendant's material support was a "but for" cause of the victim's injury or death, *Kilburn*, 376 F.3d at 1128.  Rather, the statute only requires a "showing of 'proximate cause,'" *id.*; *see also Owens v. BNP Paribas, S.A.*, No. 17-CV-7037, 897 F.3d 266, 273, 2018 WL 3595950, at \*5 (D.C. Cir. July 27, 2018)—that is, "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered," *Kilburn*, 376 F.3d at 1128 (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)); *see also Owens*, 864 F.3d at 794 (quoting same).  The proximate cause inquiry, in turn, "contains two similar but distinct elements."  *Id.*  First, "the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury."  *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).  Second, "the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct."  *Id.*  Both elements of proximate cause are satisfied here.

With respect to the first of these requirements, the Court has already concluded that Hamas could not have carried out the Ben Yehuda Street attack without the financial support and training provided by Iran.  Iran's actions, accordingly, were a "substantial factor" in the sequence

of events—a suicide bombing attack in a crowded market, leading to the death of some victims and the serious physical injuries of others, and the toll those deaths and injuries took on the direct victims' families—leading to Plaintiffs' injuries. The only remaining issue, then, is whether Plaintiffs' mental and emotional anguish resulting from the Ben Yehuda Street attack was a "reasonably foreseeable" or "natural consequence" of Iran's conduct. *Id.* at 794. Iran specifically "encourage[ed] and push[ed] Hamas to carry out such attacks as a [matter of] policy," Trial Tr. at 34, *Campuzano*, No. 00-cv-2328 (ECF 42), and it provided the training and support to Hamas needed to conduct the attack, *see id.* at 71–72, 81; Dkt. 30-4 at 14 (Shaked Expert Report). The consequences of Iran's material support—the death and injury to innocent people and the related suffering of their family members—was therefore reasonably foreseeable; indeed, it was Iran's goal. *See Owens*, 864 F.3d at 797–98 (finding the 1998 embassy bombings by al Qaeda to be a reasonably foreseeable consequence of Sudan's offer in 1991 to shelter Osama Bin Laden).

This case involves one slight twist, but that twist does not change this conclusion. Here, the state-sponsored terrorism exception applies because Iran provided material support for the "act" of "extrajudicial killing," 28 U.S.C. § 1605A(a)(1), but none of the *Campuzano* plaintiffs were, in fact, killed. As explained above, that does not defeat jurisdiction because the exception applies to claims for "personal injury or death . . . caused by an act of . . . extrajudicial killing," *id.*, and there is no doubt that the Ben Yehuda Street attack was an "act of extrajudicial killing"—five people died and their deaths were at least one of the intended purposes of the attack. This twist does, however, add a step to the proximate cause analysis: Iran's material support for Hamas foreseeably led to the act of extrajudicial killing; it was entirely foreseeable (and, indeed, intended) that those in close proximity to the murder victims would suffer grave

injuries; and it was also entirely foreseeable (and, indeed, intended) that their families would suffer grave emotional and psychological trauma as a result of the injuries suffered by their loved ones.  In the Court's view, that chain of causation readily satisfies the proximate cause standard.

 For all of these reasons, the Court concludes that Iran is not entitled to sovereign immunity and that this case falls within the Court's subject-matter jurisdiction.  *See* 28 U.S.C. §§ 1330(a), 1605A(a)(1).

The Court also concludes, for the same reasons, that Plaintiffs are entitled to relief under the federal cause of action Congress has enacted as part of the National Defense Authorization Act.  *See* Pub. L. No. 110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)).  There is almost total "overlap between the elements of [§1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity," *Foley*, 249 F. Supp. 3d at 205, and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law.  *Id*.  Indeed, the only potentially relevant difference between the exception to the FSIA and the cause of action is that, for purposes of the exception to the FSIA, it is sufficient that either "the claimant *or* the victim" was a U.S. national (or member of the U.S. armed forces or a government contractor), 28 U.S.C. § 1605A(a)(2)(A)(ii), while the federal cause of action requires that the claimant is a U.S. national (or member of the U.S. armed forces or a government contractor), *id*. at § 1605A(c). That difference is of no import here, however, because all of the Plaintiffs are U.S. nationals and were at the time of the attack.  *See* Dkt. 21 at 9; Dkt. 28-1 to 28-10; Dkt. 33-1 at 1.

## C.     Personal Jurisdiction and Service under §1608(a)

Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under

section 1608." 28 U.S.C. § 1330(b). Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with" 28 U.S.C. § 1608(a). *Barot v. Embassy of the Republic of Zam.*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Section 1608(a) "provides four methods of service in descending order of preference," *id.*:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

The first two mechanisms of effecting service—by delivery of the summons and complaint either "in accordance with any special arrangement for service between the plaintiff and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international convention on service of judicial documents" under § 1608(a)(2)—were not available to Plaintiffs. *See* Dkt. 21 at 1. No "special arrangement" governs service of process between the

United States and Iran, and "Iran is not party to an international convention on service of judicial documents." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008) (internal citations omitted). Consequently, Plaintiffs attempted to effect service on Defendants pursuant to 28 U.S.C. §1608(a)(3). On December 1, 2017, the Clerk of the Court attempted to mail the necessary documents to Defendants through DHL. Dkt. 21 at 1; *see also* Dkt 7; Dkt. 8. Those attempts failed, and the summonses were returned as unexecuted on December 18, 2017, December 21, 2017, and December 22, 2017. *See* Dkt. 13; Dkt. 14; Dkt. 15. The Clerk then requested the assistance of the U.S. Department of State to send the documents to Defendants through diplomatic means. *See* Dkt. 17 at 1. The State Department notified the Clerk that, because "the United States does not maintain diplomatic relations with . . . Iran, the Department" received the assistance of the Embassy of Switzerland in Tehran. Dkt. 17 at 1. The required documents commencing suit against Iran—the only remaining defendant in this case—were properly delivered to the Iranian Ministry of Foreign Affairs under cover of diplomatic note No. 1038-IE on April 25, 2018, and the Clerk of the Court received confirmation of delivery on May 15, 2018. *Id.*

Because Plaintiffs properly effected service on Iran under 28 U.S.C. § 1608(a)(4), this Court has personal jurisdiction to hear the claims against Iran. 28 U.S.C. § 1330(b); *see also Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 34 (D.D.C. 2018).

## D. Solatium Damages

The federal cause of action expressly contemplates the award of solatium damages to the close relatives of terrorism victims. *See* 28 U.S.C. § 1605A(c). An award of solatium is intended to compensate for the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the

harm caused by the loss of the decedent." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). There exists a "'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) (quoting *Kim v. Democratic People's Republic of Korea*, 87 F.3d 286, 290 (D.D.C. 2015)). Moreover, solatium damages are typically sought by "family members who were not present or injured themselves." *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017). The size of the award is based on multiple factors, including "evidence establishing an especially close relationship between the plaintiff and decedent," "medical proof of severe pain, grief or suffering on behalf of the claimant," and the particular "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011).

    *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), sets forth what is now the "standardized approach for evaluating solatium claims." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015) (quoting *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014)). Under the *Heiser* framework, "where the victim does not die, but instead only suffers injury, . . . [s]pouses [typically] receive $4 million, parents [typically] receive $2.5 million, and siblings [typically] receive $1.25 million" in solatium damages.[2] *Owens v. Sudan* ("*Owens I*"), 71 F. Supp. 3d 252, 260 (D.D.C. 2014); *see also Moradi*, F. Supp. 3d at 72. These amounts roughly track the damages awards for state law

---

[2]  In cases where the victims are deceased, the framework provides that "spouses of deceased victims receive $8 million, parents of deceased victims receive $5 million, and siblings of deceased victims receive $2.5 million." *Owens I*, 71 F. Supp. 3d 252, 260; *see also Peterson*, 515 F. Supp. 2d at 51–52.

intentional infliction of emotional distress ("IIED") claims. *See Heiser*, 466 F. Supp. 2d at 269. That symmetry is appropriate because 28 U.S.C. § 1606 requires that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606; *see also Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 51 (D.D.C. 2007), *abrogated on other grounds by Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015), and the elements of a solatium claim are "indistinguishable from an IIED claim," *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010).

Courts in this circuit have routinely applied the *Heiser* framework to calculate solatium damages in analogous FSIA cases. *See e.g. Owens I*, 71 F. Supp. 3d at 260; *Peterson*, 515 F. Supp. 2d at 51; *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 44 (D.D.C. 2014); *Kaplan*, 213 F. Supp. 3d at 38; *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 26 (D.D.C. 2017). That does not mean, however, that the Court is bound by the framework under all circumstances—or, indeed, that the just award should be the same in every case, regardless of the specific circumstances and actual suffering incurred. *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs*, 892 F.3d 348, 361–62 (D.C. Cir. 2018) ("We decline to impose *Heiser*'s framework as a mandatory scheme under the FSIA."). To the contrary, the D.C. Circuit has expressly noted that, "[w]hile past solatium awards from comparable cases are appropriate sources of guidance for district courts, 'different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damages awards.'" *Id.* at 62 (citation omitted). Courts in this Circuit have, for instance, exceeded the award amounts under *Heiser* when the circumstances of the direct victims' injuries rendered their family members' suffering especially acute. *See, e.g.*, *Hamen v. Islamic Republic of Iran*, No. 16-1394, 2019 WL 4305462, at *4–5 (D.D.C. Sept. 10, 2019); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 72 (D.D.C.

2008) (victim's kidnapping and beheading was publicly broadcast); *Estate of Bayani v. Islamic Republic of Iran*, 530 F. Supp. 2d 40, 42–43 (D.D.C. 2007) (victim was tortured for two years).

Here, Plaintiffs are not seeking damages in excess of the amounts provided by the *Heiser* framework. *See* Dkt. 21 at 14–16. The Court, accordingly, need only decide whether a downward departure is warranted. *See Fraenkel*, 892 F.3d at 361. As the D.C. Circuit has observed, "the best explanation of solatium damages in this circuit" is found in Judge Lamberth's "seminal opinion" in *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998)." *Fraenkel*, 892 F.3d at 356. *Flatow*, in turn, explains that "mental anguish" constitutes the "preponderant element of a claim of solatium;" that "damages for mental anguish are extremely fact-dependent," requiring "careful analysis on a case-by-case basis;" and that courts must consider how the plaintiff learned of the death of (or grave injury to) a loved one, the "duration of the injury," the strength or "close[ness] of the relationship and the plaintiff's loss of "companionship, love, affection, protection, and guidance," the "relative maturity or immaturity" of the plaintiff, the nature of the plaintiff's day-to-day relationship with the direct victim. 999 F. Supp. at 29–32; *see also Fraenkel*, 892 F.3d at 357. The principle take-away from all of this is that courts must consider all the relevant facts, must avoid the mechanical application of the *Heiser* framework, and must strive to award damages that treat like cases alike and that treat different cases differently.

Taking that approach here, the Court is convinced that the Campuzano and Elishis families are entitled to solatium damages in line with the *Heiser* framework. Both Diana Campuzano and Avi Elishis suffered horrific injuries, and their families suffered commensurate losses. Both Diana Campuzano and Avi Elishis suffered injuries that compromised their senses—vision loss limited to the right eye and prolonged hearing loss, respectively. *See* Dkt.

36

21-1 at 3, 7 (R. Campuzano Decl. ¶¶ 9, 19, 24); Dkt. 21-4 at 5 (B. Elishis Decl. ¶ 16). These sensory deficits made it difficult for the Campuzano and Elishis family members to communicate with the victims during the most traumatic period of their injuries. The Campuzano and Elishis families also faced the trauma of not knowing whether Diana and Avi had survived the attack. *See* Dkt. 21-1 at 3 (R. Campuzano Decl. ¶ 9); Dkt. 21-4 at 2–3 (B. Elishis Decl. ¶¶ 6–7).

Unlike Diana Campuzano and Avi Elishis, Gregg Salzman's family was immediately told, by Gregg himself, that his life was not in danger. *Compare* Dkt. 21-7 at 2 (S. Salzman Decl. ¶ 6) *with* Dkt. 21-4 at 2–3 (B. Elishis Decl. ¶ 6–7) *and* Dkt. 21-1 at 2 (R. Campuzano Decl. ¶ 6). Greg's injuries, moreover, although severe, were not as grave (or life threatening) as Diana and Avi's injuries. All of the families suffered great mental and emotional anguish at seeing their loved one in pain and in coping with the loved one's lifelong physical disabilities and mental health difficulties. Each Plaintiff has, moreover, attested that his or her life was significantly altered as a result of trying to provide emotional, financial, and caretaking support to the injured family member. Each Plaintiff is entitled to substantial solatium damages for these injuries. But, because their losses differ in degree, some adjustment is appropriate. The Court will, accordingly, award each member of the Salzman family who is a plaintiff in this action 80% of the solatium damages set forth in the *Heiser* framework and will award each member of the Campuzano and Elishis family who is a plaintiff in this action the solatium damages outlined in *Heiser*.[3]

---

[3] Although David Elishis, the father of Avi Elishis, passed away in 2006, *see* Dkt. 21-4 at 10 (B. Elishis Decl. ¶ 34), the Court, nevertheless, concludes that his estate is entitled to recover the full amount of solatium damages under the *Heiser* framework. *See, e.g.*, *Estate of Brown v. Islamic Republic of Iran,* 872 F. Supp. 2d 37, 44 (D.D.C. 2012) (estates of late parents entitled to recover solatium damages for injured children); *Dammarell v. Islamic Republic of Iran,* 404 F. Supp. 2d 261, 286 (D.D.C. 2005) (estate of late father entitled to recover $3.5 million in solatium damages

Consistent with this assessment, the Court will award Plaintiffs the following amounts in solatium damages: $2,000,000 for Stanley Salzman (parent); $2,000,000 for Roberta Salzman (parent); $1,000,000 for Lee Salzman (sibling); $2,500,000 for Ramiro Campuzano (parent); $2,500,000 for Mabel Campuzano (parent); $1,250,000 for Jorge Campuzano (sibling); $2,500,000 for Brenda Elishis (parent); $2,500,000 for Brenda Elishis as the administratrix of the Estate of David Elishis (parent); $1,250,000 for Sara Walzman (sibling).

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Plaintiffs' motion for default judgment as to Defendant Islamic Republic of Iran, Dkt. 21, and will award Plaintiffs compensatory damages in the amounts specified in this opinion.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 25, 2019

---

for death of daughter); *contra Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 14–15 (D.D.C. 2012) (holding that after-born children could not recover for solatium damages).